UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

ALLIANCE WELL SERVICE, LLC,                              Case No. 16-10078 t11

     Debtor.

ALLIANCE WELL SERVICE, LLC,

     Plaintiff,

v.                                                        Adv. No. 17-1008 t

J.S. WARD & SON, INC.,

     Defendant.

## <u>OPINION</u>

Before the Court is whether Defendant was within its rights to retain Plaintiff's insurance premium refund, sent to Defendant as Plaintiff's insurance agent. Defendant received the refund from the insurer and applied it to amounts Plaintiff owed under a confirmed plan of reorganization. The parties filed cross motions for summary judgment on the issue. Having reviewed the motions, supporting affidavits, and briefs, and having heard arguments of counsel, the Court concludes that Defendant's retention of the refund was improper.

I.    <u>FACTS</u>

For the limited purpose of ruling on the cross motions for summary judgment, the Court finds no genuine dispute as to the following facts:

Plaintiff is in the business of maintaining and servicing oil and gas wells. Defendant is an insurance agency licensed by the State of New Mexico.

In August 2015, Plaintiff's one-year insurance policy issued by St. Paul Fire and Marine Insurance Company ("St. Paul") was set to expire. The policy included property, inland marine,

general liability, and "umbrella" coverage. St. Paul informed Defendant that the policy would be renewed only on an "agency bill" basis, requiring that the entire premium be paid up front, and that Defendant collect any amounts due from Plaintiff.

The premium for the renewal policy was $134,042.00. The portion of the premium relating to general liability coverage was an estimate; the ultimate amount was to be determined by an audit conducted after the policy term.

St. Paul issued a one-year renewal policy (the "St. Paul Policy") to Plaintiff effective August 1, 2016. Defendant was shown as St. Paul's authorized representative. The policy contract provided that, if the audit ultimately revealed an overpayment, St. Paul would refund the overpayment to Plaintiff.

Lacking the cash to pay the premium in full, Plaintiff borrowed the money from Defendant and signed an Insurance Premium Finance Agreement. Under the agreement, Plaintiff granted Defendant a security interest in Plaintiff's right to a refund of any unearned premium. The mechanism set out in the agreement, like most premium finance agreements, allowed Defendant to cancel the policy if a loan default occurred, and then collect the refunded unearned premium and apply it to the loan balance. The agreement provides in part:

> Debtor hereby acknowledges, ratifies and confirms the existence of a security interest in the insurance described above to Secured Party, to have and to hold the same forever, upon the conditions hereof at the time in the manner specified then, and only then, title and ownership to said Insurance Policies shall vest in the Debtor and this Contract shall be void otherwise the security interest herein created to remain in full force and effect and title and ownership of said Insurance Policies to remain in Secured Party, its successors or assigns
> . . .
> A security interest is retained by the Secured Party in the aforesaid Insurance Policies until said time balance and all other obligations now existing or hereafter arising of Debtor to Secured Party are fully paid in money to the Secured Party.
> . . .
> Return premiums under said Insurance Policies upon any default in making of any payments hereunder, shall be applied to reducing or liquidating the balance due

-2-

hereunder, the surplus, if any, being paid to the Debtor. In the event of such default, the Seller or Seller's assignee may, without notice or demand, declare all installments immediately due and payable.

. . .

Any or all of the above policies may be cancelled by the Seller or Seller's assignee, at any time, after first giving ten days written notice of its intention to cancel by depositing such notice in ordinary mail directed to the Debtor at the designated address appearing above. If payment in full is not made of the unpaid balance hereunder within ten days after the mailing of such notice, the Seller or Seller's assignee may without further notice cause to be cancelled, and may demand and receive all return premium on all policies listed above, and for such purpose the Debtor hereby constitutes and appoints the Seller or Seller's assignee attorney-in-fact and agent of the Debtor. . . .

Defendant sold the agreement to Western Bank of Artesia ("Western Bank") on a "full recourse" basis, i.e., if Plaintiff defaulted under the agreement, Defendant agreed to buy it back at par. Western Bank paid Defendant $134,042.00 for the agreement. The proceeds were used to pay the premium for the St. Paul Policy.

Defendant's agency contract with St. Paul included an accounting and collection procedure used for "agency bill" insurance arrangements like Plaintiff's. Defendant was required to provide St. Paul a monthly accounting showing the premium due, premium payments collected, deductions for cancellations, refunds, and similar items. If the accounting showed that the insured owed money to St. Paul, Defendant was required to remit the amount due, whether or not it had collected the funds.

In August 2015, Defendant also renewed an automobile and rig insurance policy issued by Mountain States Mutual (the "Mountain States Policy"). Plaintiff did not pay the entire premium at policy inception; on December 22, 2015, Defendant received notice from Mountain States that the policy had been cancelled for non-payment. Defendant contacted Mountain States and learned that Plaintiff would have to pay $41,374.34 immediately to reinstate the Mountain States Policy. Defendant so informed Plaintiff.

-3-

Again because Plaintiff lacked the cash, Plaintiff and Defendant entered into a new premium finance agreement on December 24, 2015, replacing the existing agreement. The new agreement financed both the Mountain States reinstatement premium and the unpaid balance of the existing agreement. These totaled $122,480.06. Like the first premium finance agreement, Defendant sold the new agreement to Western Bank, on a full recourse basis. The first agreement was deemed paid in full as part of the transaction.

Plaintiff filed this Chapter 11 case on January 19, 2016. On January 28, 2016, Western Bank demanded that Defendant buy back the new insurance premium finance agreement. Defendant did so, paying Western Bank $123,483.41.

Between March 3, 2016, and July 14, 2016, Plaintiff paid Defendant $88,595.42 ($561.66 per day) in court-ordered adequate protection payments on account of the premium finance agreement.

On August 11, 2016, Plaintiff filed a plan of reorganization (the "Plan"). The Court confirmed the Plan on October 7, 2016. The confirmed Plan provides, in part:

> Since March 3, 2016, Debtor has paid to J.S. Ward semimonthly payments equal to the daily rate of $561.66, in order to adequately protect J.S. Ward from the loss of value of its collateral. Debtor proposes to continue these adequate protection payments to J.S. Ward under the Plan until the secured portion of J.S. Ward's claim is paid in full . . . [Thereafter] J.S. Ward shall be required to file and serve a Notice of Outstanding Balance Due on its claim within thirty days. If J.S. Ward does not file and serve such notice within thirty days of the expiration of the insurance policies, no fraction of its claim will be classified as a general unsecured claim and J.S. Ward will have no further distribution on its claim.

The Plan also includes a "Confirmation Injunction:"

> Except for those creditors or claimants to whom the Reorganized Debtor is affirmatively required to make payments under this Plan, entry of the Confirmation Order will permanently enjoin all persons who have held, hold, or may hold Claims or Interests on and after the Effective Date . . . (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or the Reorganized Debtor or against the property of the Debtor, the Estate, or the Reorganized Debtor

-4-

with respect of any such Claim; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due from the Debtor or the Reorganized Debtor, or against the property of the Debtor, the Estate, or the Reorganized Debtor with respect to any such Claim. This Confirmation Injunction shall survive closure of this bankruptcy.

Finally, the Plan provides:

Property Free and Clear of Liens. All Property of the Estate and Debtor . . . shall be free and clear of all Claims and interest of creditors, Interest holders, and other parties in interest, except as specifically provided for in the Plan or the Confirmation Order.

Full and Final Satisfaction. The final payments and distributions provided in respect of each Allowed Claim in the Plan shall be in full settlement of each such Allowed Claim to such Claimant.

On November 7, 2016, Defendant filed a Notice of Outstanding Balance Due, showing a total amount due of $46,269.12, which included the unpaid loan balance of $34,887.99 and $11,905.90 in attorney fees and related legal expenses.

On November 9, 2016, St. Paul notified Defendant that it had completed its audit of the St. Paul Policy, and that Plaintiff had overpaid by $48,032.00.[1] Instead of sending the overpayment (the "Refund") to Plaintiff, on or about January 16, 2017, St. Paul transferred the Refund to Defendant. Defendant wrote to Plaintiff the next day, asserting a security interest in the Refund and stating that it would apply the Refund to its remaining claim against Plaintiff. Plaintiff disagreed and demanded that Defendant turn the Refund over immediately. Defendant refused the demand.

---

[1] This overpayment was due primarily to an overestimation of Plaintiff's payroll.

## II.    DISCUSSION

A.    Ownership of the Refund.

There is no dispute about who owns the Refund: Plaintiff does. The insurance contract makes that clear. The fact that Plaintiff borrowed money from Defendant to finance the premium for the St. Paul Policy does nothing to alter this fact.  Defendant is a lender, and at one time held a security interest in any unearned premium, but it never owned the policy or any unearned premium.

B.    Defendant's Security Interest.

The premium finance agreements granted Defendant a security interest in Plaintiff's rights under the St. Paul Policy. Under the agreements and New Mexico law, Defendant had the right, upon ten days' written notice of default, to cancel the policy, collect any unearned premium from the insurer, and to apply it to the loan balance. N.M.S.A. § 59A-45-11(C)-(E). Any remaining surplus, of course, would be paid over to Plaintiff. N.M.S.A. § 59A-45-11(F).

Plaintiff's confirmed Plan provided for full payment of Defendant's secured claim, through daily adequate protection payments of $561.66. Once Defendant's secured claim was paid in full, the Plan treated the balance of the claim as a general unsecured claim. The Plan provided that Plaintiff's property (including the Refund), would be free of Defendant's lien after confirmation.

As contemplated, Plaintiff paid Defendant's secured claim in full. On November 7, 2016, Defendant filed a notice that its remaining claim was $46,269.12. This amount was a general unsecured claim. Defendant's security interest in any unearned premium, and in particular in the Refund, did not survive plan confirmation and the payment of Defendant's secured claim. When St. Paul sent the Refund to Defendant, therefore, Defendant had no more lien rights in the Refund

-6-

than any other creditor. Defendant's right to keep the Refund cannot be based on a lien or security

interest.

C.     Setoff.

Section 553 of the Code provides in part:

> (a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—
> . . .
>> (2) such claim was transferred, by an entity other than the debtor, to such creditor--
>>> (A) after the commencement of the case;
>> . . .

Section 553 allows the offset of outstanding debts against one another, provided that the debts

arose pre-petition and are "mutual." *In re Lehman Bros. Holdings, Inc.*, 404 B.R. 752, 757 (Bankr.

S.D.N.Y. 2009); *see also In re Myers*, 362 F.3d 667, 672 (10th Cir. 2004). "Mutuality" exists when

"debts and credits are in the same right and are between the same parties, standing in the same

capacity." *Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730,

739 (Bankr. S.D.N.Y. 1995). Simply stated, "a right to setoff under § 553 arises only when the

mutual debt and claim both arose pre-petition." *In re Myers*, 362 F.3d at 672 (citing *United States*

*v. Gerth*, 991 F.2d 1428, 1431 (8th Cir. 1993)).

Here, Defendant claims a right to offset its remaining claim against the Refund. For a

number of reasons, the argument fails.

1.     The Refund is a Post-Petition Debt. First, although the Refund resulted from a pre-

petition insurance policy, St. Paul had no obligation to pay the Refund until it completed its audit,

which could not have been done until eight months after the petition date. Similarly, Defendant

had no obligation to forward the Refund to Plaintiff until Defendant received it on January 16,

-7-

2017. In either case, the obligation to Plaintiff arose post-petition. Section 553 prohibits Defendant from setting off its pre-petition claim with a post-petition debt.

2. <u>Defendant Bought the Claim Post-Petition</u>. Second, Defendant did not own its claim against Plaintiff on the petition date. After learning about Plaintiff's bankruptcy filing, Western Bank demanded that Defendant repurchase the premium finance agreement. Defendant did so on or about January 28, 2016, nine days post-petition. Section 553(a)(2)(A) prohibits Defendant from setting off its obligation to Plaintiff with a claim transferred to Defendant post-petition.

3. <u>The Confirmation and Discharge Injunctions</u>. Third, even if Defendant had a right of setoff, the Confirmation Injunction prevents Defendant from exercising the right. Similarly, the Code's discharge injunction "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived. . . ." § 524(a)(2). Because of these injunctions, Defendant cannot retain the Refund under a setoff theory.

D. <u>Recoupment</u>.

Defendant also relies on the doctrine of recoupment to justify keeping the Refund. Recoupment is an equitable doctrine that, in bankruptcy, permits a creditor to withhold funds owed to the debtor if the debtor owes money to the creditor arising from the same transaction. In *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.)*, 82 F.3d 956 (10th Cir. 1996), the Tenth Circuit stated:

> Although modern counterclaim doctrine has replaced common law recoupment in most areas of the law, recoupment remains a distinct doctrine in bankruptcy cases, *Davidovich v. Welton (In re Davidovich),* 901 F.2d 1533, 1537 (10th Cir. 1990) (per curiam). Originally an equitable rule of joinder for claims arising out of a single transaction, recoupment allowed adjudication in one suit of two claims that

-8-

otherwise had to be brought separately under the common law forms of action. *Id.* *Davidovich* described recoupment as follows:

> In the modern bankruptcy setting, this rule [of recoupment] has evolved to permit a creditor to offset a claim that " 'arises from the same transaction as the debtor's claim,' " without reliance on the setoff provisions and limitations of [11 U.S.C.] section 553, because the creditor's claim in this circumstance is " 'essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable.' "

> *Id.* (quoting *Lee v. Schweiker,* 739 F.2d 870, 875 (3rd Cir. 1984)).

82 F.3d at 959. The court continued:

> The doctrine of recoupment may be better understood by way of comparison with the doctrine of setoff. Setoff, codified in 11 U.S.C. § 553(a), gives a creditor the right "to offset a mutual debt owing by such creditor to the debtor" provided that both debts arose before commencement of the bankruptcy action and are in fact mutual. [*See In re Davidovich,* 901 F.2d at 1537]. The creditor's mutual debt and claim generally arise from *different* transactions. 4 *Collier on Bankruptcy* § 553.03, at 553–14 (Lawrence P. King et al. eds., 15th ed. 1996). "Recoupment, on the other hand, is the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action . . . ." *Id.* at 553–15. Recoupment allows the defendant, in a suit between the estate and another, "to show that because of matters arising out of the transaction sued on, he or she is not liable in full for the plaintiff's claim." *Id.* at 553–17. Thus, recoupment is an equitable doctrine that allows the determination of a "just and proper liability" regarding such a claim. *Id.*
> Recoupment is "narrowly construed" in bankruptcy cases because it violates the basic bankruptcy principle of equal distribution to creditors. [citations omitted] . . . [F]or the purposes of recoupment, "same transaction" is a term of art that must be narrowly defined. [citations omitted] . . . The Third Circuit held in *University Medical Center* that for claims to arise from the "same transaction" for the purposes of recoupment "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." 973 F.2d at 1081.

82 F.3d at 959-60. More recently the Tenth Circuit held that, when considering whether the doctrine of recoupment can be invoked,

> This Court must examine the equities of the case, and determine whether the claims "are so closely intertwined that allowing the debtor to escape its obligation would be inequitable . . . ."

*In re Beaumont*, 586 F.3d 776, 781 (10ᵗʰ Cir. 2009) (quoting *Peterson Dist.*, 82 F.3d at 960).

In *In re Lunt*, 500 B.R. 9 (D. Kan. 2013), the district court affirmed a decision by the bankruptcy court to allow recoupment. In discussing the issue, the court analyzed *Peterson Dist.*, saying:

> There, the Tenth Circuit put great emphasis on the equities of the case. The court found that—despite the existence of a single franchise agreement that covered both obligations at issue—the obligations were not "so closely intertwined" that it would be equitable to allow Conoco (the creditor) to recover its losses at the expense of the other creditors. [82 F.3d at 962]. Further, as the bankruptcy court noted, the Tenth Circuit noted there was "no overriding equitable reason . . . that compels the application of the doctrine of recoupment in this case" *Id.*

500 B.R. at 16-17.

"The fact that the same two parties are involved [in the claims to be offset], and that a similar subject matter gave rise to both claims . . . does not mean that the two [claims] arose from the 'same transaction' for purposes of the doctrine of recoupment." *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1538 (10ᵗʰ Cir. 1990) (quoting *Lee v. Schweiker*, 739 F.2d 870, 875 (3ʳᵈ Cir. 1984)).

If recoupment can be invoked, then exercising the right of recoupment would not violate the discharge injunction. As stated in *Lunt*:

> the court must determine whether the Trustee's actions in offsetting Debtor's interest obligation on the Note against the income distribution violates the discharge injunction. The answer depends on whether the doctrine of recoupment applies. If recoupment applies, then no "debt" or "claim" exists as defined in the Bankruptcy Code, and the Trustee did not violate the injunction. *See Beaumont v. Dep't of Veteran Affairs (In re Beaumont)*, 586 F.3d 776, 781 (10th Cir. 2009) (citing *Aetna U.S. Healthcare, Inc. v. Madigan (In re Madigan)*, 270 B.R. 749, 754 (B.A.P. 9th Cir. 2001) . . . .

500 B.R. at 15-16.

-10-

Defendant argues that it should be allowed, under the recoupment law outlined above, to recoup its remaining unsecured claim from the Refund. For the reasons discussed below, Defendant's argument must be overruled.

1.     The Claims at Issue are not Part of a Single Integrated Transaction. Defendant's claim to the Refund is not part of the same "single integrated transaction" that generated its pre-petition claim against Plaintiff. Rather, the claims stem from separate transactions. In the first one, St. Paul sold an insurance policy to Plaintiff and collected a $134,042.00 premium, subject to a post-policy audit and adjustment. Defendant acted as St. Paul's agent in the transaction and received a commission, but Defendant was not a party to the insurance contract. In the second transaction, Defendant loaned Plaintiff money to pay the policy premium, and obtained a security interest in Plaintiff's rights under the policy. St. Paul was not a party to the loan transaction, as shown by, inter alia, Defendant's sale of the financing agreement to a third party without St. Paul's participation or consent.

Had St. Paul been both insurer and lender, the result might well be different. As it is, the two contracts are separate (albeit related) transactions, rather than a single, integrated transaction.

2.     The Equities Do Not Favor Recoupment. The Court concludes that the equities do not favor recoupment. Defendant is owed money, to be sure, and has a more compelling claim to the Refund than the average unsecured creditor. On the other hand, St. Paul should have sent the Refund to Plaintiff, not Defendant. For Defendant, the Refund was "manna from heaven." The treatment of Defendant's secured and unsecured claims against Plaintiff was set out in the Plan; the Refund clearly played no part in that treatment. Upon receipt of the unanticipated Refund, Defendant should have sent it to Plaintiff, or else deposited it in the Court registry and sought a ruling on the rights of the parties.

-11-

### III.    CONCLUSION

The Refund is Plaintiff's property. It came into Defendant's possession innocently enough, but Defendant held no security interest in the Refund and had no setoff, recoupment, or other right to keep it. Defendant's retention of the Refund violated the confirmation and discharge injunctions. Plaintiff's motion for partial summary judgment will be granted by separate order.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: October 27, 2017

Copies to:

Nephi D. Hardman
William F. Davis & Assoc., P.C.
6709 Academy NE, Ste. A
Albuquerque, NM 87109

Nancy S. Cusack
Hinkle Shanor LLP
P.O. Box 2068
Santa Fe, NM 87504-2068

-12-